## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

VINCENT GEORGE, CYRIL MATTHEW  :
and GEORGE JOSEPH,            :
     Plaintiffs,            :
                   :
v.                           :    Case No. 3:04cv1073 (PCD)
                   :
UNITED STATES POSTAL SERVICE;   :
JOHN E. POTTER, POSTMASTER     :
GENERAL; and NATIONAL POSTAL   :
MAIL HANDLERS UNION,          :
     Defendants.            :

## RULING ON MOTION FOR SUMMARY JUDGMENT

Defendant National Postal Mail Handlers Union ("NPMHU") moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on Count IV of Plaintiffs' Complaint.  Defendants United States Postal Service and John E. Potter (collectively "USPS") move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on Counts I, II and III of Plaintiffs' Complaint.  Plaintiffs object to Defendants' Motions for Summary Judgment, arguing that there are "sufficient genuine issues of material fact" to warrant submission of the claims against Defendants to a jury.  For the reasons stated herein, Defendant NPMHU's Motion for Summary Judgment [Doc. No. 35] is **granted** and Defendants USPS's Motion for Summary Judgment [Doc. No. 39] is **granted**.

## I.    BACKGROUND[1]

Plaintiffs filed this suit on July 1, 2004, alleging that Defendants USPS discriminated against them on this basis of their Indian national origin (Count I) and retaliated against them for

---

[1]    The statement of facts that follows is derived primarily from Plaintiffs' Complaint and the parties' Local Rule 56 statements and is supplemented, where necessary, by the parties' briefs.  To the extent necessary, the facts will be addressed in more detail in the discussion that follows.

engaging in protected activity in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., ("Title VII") (Count II) and violated the collective bargaining agreement ("CBA") pursuant to Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, between NPMHU and USPS (Count III).  Plaintiffs also allege that Defendant NPMHU breached its duty of fair representation and violated Section 301 of the LMRA by declining to prosecute grievances on Plaintiffs' behalf in connection with their contention that they should have been converted from part-time flexible ("PTF") employees to full-time regular ("FTR") mail handlers (Count IV).

Because this case is at the summary judgment stage, this Court views the record in the light most favorable to Plaintiffs, the non-moving party.  See Terry v. Ashcroft, 336 F.3d 128, 139 (2d Cir. 2003).  Most of the underlying facts are undisputed.[2]

Plaintiffs are all individuals of Indian descent (non-Native American) residing in West

---

[2]    Plaintiffs' Rule 56(a)(2) Statement admits 42 of the 47 factual assertions set forth in Defendants' Local Rule 56(a)(1) Statement.  Local Rule 56(a)(3) requires the party opposing a motion for summary judgment to follow each denial in their Rule 56(a)(2) Statement "by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial." D. Conn. Loc. Civ. R. 56(a)(3).  Plaintiffs deny statement numbers 13 and 30 without any citations at all.  Moreover, their denials of statement numbers 26, 37 and 45 cite deposition transcript that does not adequately support the denials. See Pls' Rule 56(a)(2) Statement.  When a party fails to appropriately deny material facts set forth in the movant's Rule 56(a)(1) statement, those facts are deemed admitted.  See SEC v. Global Telecom Servs. L.L.C., 325 F. Supp. 2d 94, 109 (D. Conn. 2004) ("Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."); Root v. Liston, 363 F. Supp. 2d 190, 191 n.1 (D. Conn. 2005); Martin v. Town of Westport, 329 F. Supp. 2d 318, 323 n.1 (D. Conn. 2004).  Accordingly, the factual assertions set forth in Defendants Rule 56(a)(1) Statement will be admitted, however, the Court notes its continued adherence to the Second Circuit's admonition that "it is incumbent upon a court in a discrimination case to examine 'the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff. '" Lizardo v. Denny's, Inc., 270 F.3d 94, 101 (2d Cir. 2001) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000)) (citation omitted); see Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 382 (2d Cir. 2001) (noting that in evaluating the merits of a Title VII case, the task is "to examine the entire record and, in accordance with Reeves, make the case-specific assessment as to whether a finding of discrimination may reasonably be made").

Hartford, Connecticut.  Compl. ¶¶ 1-3.  Defendant USPS is a quasi-governmental agency which provides mailing services to the general public, employs over 500,000 individuals and maintains offices throughout the State of Connecticut.  Id. ¶ 4.  Plaintiffs are members of NPMHU, the collective bargaining unit for USPS employees holding mail handler positions.  Id. ¶ 5.  NPMHU and USPS are parties to a CBA which defines the terms, conditions and privileges of the employment relationship between NPMHU members and the USPS.  Id.

Plaintiffs have been employed with USPS as mail handlers at the USPS Hartford Processing and Distribution Center ("Hartford P&DC") since 1998 and, during their entire tenure, have been designated as PTF employees.[3]  Id. ¶ 6; NPMHU Brief at 1.  Plaintiffs allege that as PTF employees, they have "consistently worked in excess of forty (40) hours per week," the equivalent of FTR employees as defined by Article 7.3 of the CBA,[4] without being elevated to FTR employee status.  Compl. ¶ 7.  Plaintiffs contend that pursuant to Article 7.3 of the CBA, other similarly-situated but non-protected class USPS mail handlers have been converted from PTF employees to FTR employees, whereas Plaintiffs have remained PTF employees.  Id. ¶ 9.[5]

In or about 2000, the USPS District of Connecticut began, statewide, to automate the

---

[3] PTF employees are those most recently hired.  USPS Brief at 4.  Although PTF employees receive a higher hourly wage than do FTR employees, they have no fixed schedules or workplace assignments, are not guaranteed a certain number of hours per week, have no right to place themselves on the overtime list, have no right to bid on jobs and do not receive paid holidays.  Id. (citing Morissette Depo. at 10-11; George Depo. at 136); Defs' Rule 50(a)(1) Statement ¶ 9.  PTF employees are generally "available to work flexible hours as assigned by the Employer during the course of a service week."  CBA Art. 7.1(A2), Morissette Decl. at Exh. A; Defs' Rule 50(a)(1) Statement ¶ 9.

[4] Article 7.3 of the CBA provides, in relevant part, that: "A part-time flexible employee working eight (8) hours within ten (10) on the same five (5) days each week over a six-month period will demonstrate the need for converting the assignment to a full-time position."  CBA Art. 7.3, Morisette Decl. at Exh. A.

[5] There is no evidence in support of this assertion.

processing of "flat mail" by using a mechanized sorter machine, the Automated Flat Sorting Machine 100 Model, and subsequently also began using the Automated Parcel and Package Sorter.  See Defs' Rule 56(a)(1) Statement ¶ 4 (citing Gillis Aff. ¶¶ 15-16).  In addition, in 2001, the USPS projected the consolidation of its Bridgeport and Waterbury facilities, the net result of which would be, over the course of several years, to eliminate the jobs of a number of postal employees, particularly those who sort mail.[6]  Id.  The USPS and the unions that represent postal employees have agreed that rather than laying off displaced postal employees, full-time jobs—or "bids"—that become vacant and are not filled by another full-time employee will be "withheld" and reserved for those employees expected to be "excessed" by technology, consolidation, a decrease in mail volume or any other reason.  See USPS Brief at 3 (citing CBA Art. 12.6, Morissette Decl. at Exh. A; Gillis Depo. at 16; Gillis Aff. ¶ 17-18); Defs' Rule 56(a)(1) Statement ¶¶ 5 (citing Gillis Aff. ¶ 14-22).  If a vacant bid was not withheld pursuant to Article 12.6, it would—unless the USPS decided to "revert," or eliminate, the position pursuant to Article 12.2(D8)—normally be filled by converting the most senior PTF employee to FTR status. Defs' Rule 56(a)(1) Statement ¶ 8 (citing Gillis Depo. at 10-11, 15).  From February 2001 through July 1, 2004, the date of the Complaint, the USPS District of Connecticut was proceeding under Article 12 and withholding bids that became vacant as specified above.  Id. ¶ 7 (citing Gillis Aff. ¶ 20).

Defendants explain that PTF employees are typically converted to FTR employees in

---

[6]     Specifically, Mark Gillis, the Manager of Labor Relations for the USPS's Connecticut District, asserts that "it was anticipated that automation resulting from introduction of the [Automated Parcel and Package Sorter] would, over the course of a few years, eliminate or 'excess' the jobs of 48 USPS 'clerks' in Hartford and 66 USPS 'clerks' in Wallingford." Gillis Aff. ¶ 16; see also Defs' Rule 56(a)(1) Statement ¶ 4; Pls' Rule 56(a)(2) Statement ¶ 4.

4

order of their relative seniority as bids become vacant, which, under "normal circumstances," can happen after working only a few months.  Id. ¶ 10; see also George Depo. at 97-99 (plaintiff George asserting that in 1998, a PTF employee was converted to FTR status after only three months of employment).  When the Hartford mail facility was placed under Article 12, however, vacant mail handler bids were withheld for the employees expected to be excessed as a result of the automation and consolidation of their job functions.  As a result of the move toward automation and the resulting consolidation of employees' job functions, no PTF mail handlers were converted to FTR employees during a period of more than four years, from February 2001 through April 2005, at the Hartford P&DC.  See id. ¶ 11; see also George Admission No. 4; Joseph Admission No. 4; Matthew Admission No. 4; George Depo. at 18-19; Gillis Depo. at 13-14).  Finally, in April 2005, the top four PTF mail handlers on the seniority list at the Hartford P&DC, including plaintiff Joseph, were converted to FTR employees.[7]  Id. ¶ 12; George Depo., Exh. 2 (seniority list); Joseph Depo. at 7-8.

Plaintiffs initiated the Equal Employment Opportunity ("EEO") process on or about February 11, 2004 by submitting requests for pre-complaint counseling and subsequently, on or about March 25 and 29, 2004, filed EEO complaints.  See Defs' Rule 56(a)(1) Statement ¶ 31-32 (referencing George Depo., Exh. 6, 7; Joseph Depo., Exh. 10, 11; Matthew Depo., Exh. 14, 15).  Plaintiffs, in their EEO complaints, raise the conversion concern and claim that Defendants discriminated against them on the basis of their Indian national origin:

---

[7]    Of the 29 PTF employees at the Hartford P&DC, plaintiff Joseph, hired November 7, 1998, ranked second in seniority during the relevant time period, whereas plaintiffs George and Matthew, hired on June 17, 2000 and July 1, 2000, ranked twenty-fourth and twenty-sixth, respectively.  Defs' Rule 56(a)(1) Statement ¶ 15 (citing George Depo., Exh. 2; George Admission Nos. 2, 3; Joseph Admission Nos. 2, 3; Matthew Admission Nos. 2, 3; Gillis Aff. ¶¶ 6-7); Pls' Brief at 4.

> While designated as a Part-Time Flexible (PTF) employee, complainant has continuously worked over forty (40) hours per week for several years, yet, complainant has not obtained full-time status in contrast to similarly-situated employees as well as those with less seniority.

George Depo., Exh. 7; see also Joseph Depo., Exh. 11; Matthew Depo., Exh. 15.

The CBA provides for the resolution of labor disputes through arbitration. See CBA Art. 15, Morissette Decl. at Exh. A. Accordingly, at the same time as they initiated EEO proceedings against USPS, on or about February 11, 2004, Plaintiffs also sent letters to René Morissette, President of NPMHU, Branch 34, asking him to file grievances on their behalf:

> I would like to file a grievance, because management did not changing [sic] my employment status part time flexible to full time regular. Last 4 years I was working more than 40 hours a week. Management failer [sic] to follow union agreement. So I wanted to file a grievance against this case.

George Depo., Exh. 4; see also Joseph Depo., Exh. 9; Matthew Depo., Exh. 13; Defs' Rule 56(a)(1) Statement ¶ 33.[8] NPMHU claims that upon receipt of these letters, "Morissette checked the plaintiffs' work schedules for the previous six months and reviewed the relevant portions of the collective bargaining agreement between USPS and NPMHU," which "led him to determine that there was no basis under the collective bargaining agreement for the requested grievances." Defs' Rule 56(a)(1) Statement ¶ 34. Defendants assert, and Plaintiffs admit, that Morissette's investigation revealed that during the six-month period prior to Plaintiffs' letter, none of the three plaintiffs had worked eight hours within ten on the same five days each week. See id; Pls' Rule 56(a)(2) Statement ¶ 34. Morissette's conclusion that Plaintiffs' complaints had no merit was also based, in part, on a portion of Article 7.3 of the CBA which states that: "The [USPS] shall

---

[8]     Plaintiffs claim that they previously spoke to Morissette about the grievance procedure for failure to convert but assert that he "turned a deaf ear to the plaintiffs' request prior to February 2004." Pls' Brief at 4.

staff all postal installations which have 200 or more man years of employment in the regular

work force as of the date of this Agreement with 90% full-time mail handlers."  CBA Art. 7.3,

Morisette Decl. at Exh. A.  In his letters to Plaintiffs, Morissette explained that this provision

"means that the part-time flexible compliment cannot exceed 10%."  George Depo., Exh. 4;

Joseph Depo., Exh. 9; Matthew Depo., Exh. 13.  Morissette goes on to say that the Hartford

Installation had, at that time, 331 FTR employees and 29 PTF employees, but would have to have

37 PTF employees (or would need to drop to 260 full-time regular employees) in order to convert

one PTF employee to full-time regular status.[9]  Id.  Morissette concluded by saying that "[w]hile

the Union would love to file a grievance for all part-time flexible[s] to be converted to full-time

regulars we are bound by the National Agreement . . . ."  Id.

Plaintiff claim that they "raised concerns that bids remained vacant or withheld for

unreasonably long periods of time," however, the letters to Morissette reveal no such concern.

See Pls' Brief at 5; George Depo., Exh. 4; Joseph Depo., Exh. 9; Matthew Depo., Exh. 13.

Pursuant to the "bidding process," once a month, a bid listing is posted for FTR employees to bid

on jobs, which are awarded based on seniority.  See Morissette Depo. at 11-12, Pls' Exh. 4.  In

his deposition, Morissette asserts that when a vacancy persists, bids could be abolished, could be

held under Article 12 (if the postal service anticipates a need to excess employees in the "near

future") or unassigned FTR employees could be "forced" into the bid positions.  See Morissette

Depo. at 12, Pls' Exh. 4.  Plaintiffs contend that during Morissette's tenure as Branch President,

"in excess of twenty (20) vacancies were withheld pursuant to Article 12 of the CBA."  Pls' Brief

_____

[9]       Plaintiffs admit that, at the time of their Complaint, the Hartford P&DC was in compliance with
the ninety percent full-time employment level required by Article 7.3 of the CBA.  See Defs' Rule
56(a)(1) Statement ¶ 34; Pls' Rule 56(a)(2) Statement ¶ 34.

7

at 5.

## II.    FAILURE TO TIMELY RESPOND

Defendants argue that summary judgment should be granted in their favor based on Plaintiffs' failure to timely respond to their summary judgment motion.  See Defs' Reply at 1-4. Defendants served their motion on Plaintiffs' counsel on July 26, 2005, in conformity with the Supplemental Order.  Defendants waited the allotted twenty-one days, but received no response from Plaintiffs or Plaintiffs' counsel.  Accordingly, Defendants filed their summary judgment papers on August 23, 2005, noting that the motion for summary judgment was unopposed. Plaintiffs filed their opposition papers with this court on September 13, 2005, however, they provided no explanation or excuse for their failure to timely file a response.  Defendants filed a reply on September 21, 2005.  Although this court has discretion to decline to consider submissions not filed in compliance with its rules and orders, Defendants have not been prejudiced by the delay and their motion for summary judgment is granted on the merits. Because Defendants' motion is granted on other grounds, the court will consider Plaintiffs' opposition papers.

## III.    STANDARD OF REVIEW

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio

8

Corp., 475 U.S. 574, 587 69, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)).  A material fact is one

which "might affect the outcome of the suit under the governing law" and an issue is genuine

when "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202

(1986)).  Importantly, however, "[c]onclusory allegations will not suffice to create a genuine

issue."  Delaware & H. R. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990).

 The moving party bears the burden of establishing that summary judgment is appropriate,

Anderson, 477 U.S. at 255, and the court should "draw all factual inferences in favor of the party

against whom summary judgment is sought, viewing the factual assertions in materials such as

affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion."

Rodriguez v. City of N.Y., 72 F.3d 1051, 1060 (2d Cir. 1995) (citations omitted).

Determinations of the weight to accord evidence or assessments of the credibility of witnesses

are improper on a motion for summary judgment as such are within the sole province of the jury.

Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996).  "If reasonable minds could

differ as to the import of the evidence . . . and if . . . there is any evidence in the record from any

source from which a reasonable inference in the nonmoving party's favor may be drawn, the

moving party simply cannot obtain a summary judgment."  R.B. Ventures, Ltd. v. Shane, 112

F.3d 54, 59 (2d Cir. 1997) (internal citations omitted); see also Sologub v. City of New York,

202 F.3d 175, 178 (2d Cir. 2000) ("When reasonable persons applying the proper legal standards

could differ in their responses to the questions raised on the basis of the evidence presented, the

question is best left to the jury.").

 "At summary judgment in an employment discrimination case, a court should examine

the record as a whole, just as a jury would, to determine whether a jury could reasonably find an

invidious discriminatory purpose on the part of an employer." Byrnie v. Town of Cromwell,

Board of Education, 243 F.3d 93, 102 (2d Cir. 2001).  Although caution must be exercised before

granting summary judgment to an employer in an ADEA case where discriminatory intent and

state of mind are in dispute, see Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir.

2000),

> [i]t is now beyond cavil that summary judgment may be appropriate even in the
> fact-intensive context of discrimination cases. . . . "[T]he salutary purposes of
> summary judgment—avoiding protracted, expensive and harassing trials—apply no
> less to discrimination cases than to . . . other areas of litigation."

Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (quoting Meiri v. Dacon,

759 F.2d 989, 998 (2d Cir. 1985)); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S.

133, 148 (2000) ("Trial courts should not treat discrimination differently from other ultimate

questions of fact").

## IV.    DISCUSSION

USPS claims that no PTF employees were converted to FTR status between February

2001 and April 2005 because Connecticut's USPS facilities were "placed under Article 12" as a

result of the projected automation and consolidation and, consequently, vacant bids were

"withheld" and reserved for FTR clerks and other FTR employees whose jobs were expected to

be "excessed" as a result of the anticipated changes.  USPS Brief at 4 (citing Gillis Aff. ¶¶ 14-

22).  USPS argues that Plaintiffs' employment discrimination and retaliation claims have no

merit and that the failure to convert Plaintiffs to full-time regular employment status was "fully

consistent with the collective bargaining agreement."  See USPS Brief at 2, 4.

A.     **Discrimination**

1.     Title VII's Burden Shifting Analysis

Title VII prohibits employment discrimination on the basis of "race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a)(1).  Plaintiffs contend that USPS failed to convert them from PTF employees to FTR employees because of their Indian national origin.  Compl. ¶ 13.

Title VII claims are analyzed under the familiar burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).   In order to survive a motion for summary judgment, a plaintiff must first make a prima facie case of national origin discrimination by presenting evidence sufficient to create an inference that the employer's decision was based on an illegally discriminatory criterion.  Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 358 (1977).  If the plaintiff is able to make out a prima facie case of discrimination, the burden then shifts to the defendant to establish a legitimate, nondiscriminatory business reason for its action.  See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).  Although the McDonnell Douglas framework places the burden on the defendant of producing an explanation to rebut the plaintiff's prima facie case, it is important to remember that the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated on the basis of an impermissible factor remains at all times with the plaintiff.[10]  Burdine, 450 U.S. at 253.  If the employer succeeds in articulating such a reason, the presumption of discrimination arising from the establishment of the prima facie case "drops from

---

[10]     The presumption operates, in this regard, like all other presumptions, as described in Federal Rule of Evidence 301: "In all civil actions and proceedings . . . a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast."

the picture" and the burden shifts back to the plaintiff to show both that the employer's proffered

reason is mere pretext for discrimination *and* that the plaintiff's national origin was the actual

motivating factor.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993); Abdu-

Brisson v. Delta Air Lines, 239 F.3d 456, 459 (2d Cir. 2001).

        2.      Plaintiffs' Prima Facie Case

To make out a prima facie case of employment discrimination, Plaintiffs must show that:

(1) they are members of a protected class; (2) they qualified for the job; (3) they suffered an

adverse employment action and (4) the adverse employment action occurred under circumstances

giving rise to an inference of discrimination.  Stern v. Trustees of Columbia Univ., 131 F.3d 305,

311-12 (2d Cir. 1997); Shumway v. United Parcel Serv., 118 F.3d 60, 64 (2d Cir. 1997).

Plaintiffs' burden at this stage is not an onerous one; they merely have to present facts sufficient

to give rise to a presumption[11] of discrimination.  See Burdine, 450 U.S. at 254; Abdu-Brisson,

239 F.3d at 467 ("A plaintiff's burden of establishing a prima facie case is de minimis.").

Defendants do not challenge the first three prongs of Plaintiffs' prima facie case, but

argue that Plaintiffs cannot establish that Defendants' failure to convert them to FTR status

"occurred in circumstances giving rise to an inference of discrimination on the basis of [their]

membership in [the protected] class."  USPS Brief at 7 (quoting Stern, 131 F.3d at 312).  The

Second Circuit has held that a "showing of disparate treatment," i.e., a showing that similarly

situated employees who are not members of the protected class were treated differently, is a

---

[11]     "To establish a 'presumption' is to say that the finding of the predicate fact (here, the prima facie case) produces a 'required conclusion in the absence of explanation' (here, the finding of unlawful discrimination)."  Hicks, 509 U.S. at 506-07 (quoting 1 D. Louisell & C. Mueller, Federal Evidence § 67, p. 536 (1977)).

"common and especially effective method of establishing the inference of discriminatory intent necessary to complete the prima facie case," but is not the only method. Abdu-Brisson, 239 F.3d at 468 (holding that a showing of disparate treatment is not the only method of making out a prima facie case of employment discrimination because in limited cases, there are no employees similarly situated to the plaintiff). Other permissible means of establishing an inference of discriminatory intent for purposes of the prima facie case include showing that the employer: (1) continued, after discharging the plaintiff, to seek applications for persons of the plaintiff's qualifications to fill the position; (2) criticized the plaintiff's performance in ethnically degrading terms; (3) made invidious comments about others in the plaintiff's protected group; or (4) treated employees not in the protected group more favorably than plaintiff. See id. (citing Chambers v. TRM Copy Ctr. Corp., 43 F.3d 29, 37 (2d Cir. 2004)).

Defendants argue that notwithstanding the assertions in their Complaint, Plaintiffs cannot show that they were treated differently than similarly situated employees who were not members of the protected class. USPS Brief at 7 (citing Abdu-Brisson, 239 F.3d at 467). Indeed, all three plaintiffs have admitted that no PTF mail handlers, regardless of national origin, were converted to FTR employees at the Hartford P&DC from February 2001 to April 2005. See George Admission No. 4 (admitting "that the last conversion of [a] part-time flexible mail handler to full-time regular status at the Hartford P&DC occurred on or about February 9, 2001"); Joseph Admission No. 4 (same); Matthew Admission No. 4 (same); see also George Depo. at 18-19 (agreeing that between February 2001 and April 2005, no mail handlers at the Hartford P&DC, of any national origin, were converted); Joseph Depo. at 12-25 (same); Matthew Depo. at 7-9, 15-18. Moreover, it is undisputed that plaintiff Joseph was among the first four PTF mail handlers

to be converted in April 2005, see Joseph Depo. at 7-8, and that the one mail handler ahead of plaintiff Joseph on the PTF seniority list was white and eleven of the twenty-three mail handlers ahead of plaintiffs George and Matthew were white.  See George Depo., Exh. 2 (PTF seniority list); Morissette Depo. at 47-48 (identifying the ethnicity of persons on the seniority list).  In light of this evidence, and without more, it does not appear that Plaintiffs were treated any differently from employees who were not members of a protected class.

Plaintiffs do not appear to present a prima facie case of discrimination, however, we need not decide that here.  Because, as a matter of law, Plaintiffs cannot meet their ultimate burden of proving that Defendants intentionally discriminated against them on the basis of their national origin, it is assumed arguendo that Plaintiffs have satisfied their burden to establish a prima facie case.  See Roge v. NYP Holdings, 257 F.3d 164, 169 (2d Cir. 2001); Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 93 (2d Cir. 2001).

3.    Defendants' Legitimate, Non-Discriminatory Reasons

Assuming that Plaintiffs have made out a prima facie case of discrimination, the burden then shifts to the employer to establish a legitimate, nondiscriminatory business reason for its action. See Burdine, 450 U.S. at 254.  Defendant's burden is "one of production, not persuasion[, and] . . . involv[es] no credibility assessment."  Reeves, 530 U.S. at 142; see also Hicks, 509 U.S. at 510-11 (1993) (explaining that "the burden of production determination necessarily precedes the credibility-assessment state").  Defendant "need not persuade the court that it was actually motivated by the proffered reasons . . . . [as i]t is sufficient if the defendant's evidence raise a genuine issue of fact as to whether it discriminated against the plaintiff."  Burdine, 450 U.S. at 254.  To carry its burden and raise a genuine issue of fact, Defendant must, using admissible

14

evidence, set forth reasons which are sufficient to support a finding that unlawful discrimination was not the cause of the employment action.  Id. at 254-255 and n. 8.

Defendants have articulated a legitimate non-discriminatory reason for their failure to convert Plaintiffs, namely, that no mail handlers, regardless of national origin, on the PTF seniority list were converted to FTR employees at the Hartford P&DC between February 2001 and April 2005 because USPS District of Connecticut needed to withhold bids pursuant to Article 12 of the CBA for FTR employees expected to be displaced by automation and consolidation.  See Defs' Rule 56(a)(1) Statement ¶ 13 (citing Gillis Aff. ¶¶ 14-22; Gillis Depo. at 18-19).  Defendants' reason is well-documented by the evidence.

                4.        <u>Evidence that Defendants' Proffered Reasons are Pretext for Discrimination and that Plaintiffs' National Origin was the True Reason for Discharge</u>

Plaintiffs present almost no evidence in support of their contention that Defendants failed to convert them to FTR employees because of their national origin.  They argue that "conversions took place in February 2001 despite the practical impact of Article 12 in that vacant bids were withheld" and that "the authority to convert PTF employees was implemented unilaterally by the USPS."  Pls' Brief at 16 (citing Exh. 4 at 40).  The only evidence submitted by Plaintiffs in support of this argument was Morissette's statement that "management can decide when they're going to convert a PTF."  Pls' Exh. 4 at 40.  Plaintiffs argue that because the February 2001 and April 2005 conversions complied with the CBA and because management has the authority to convert PTF employees, a reasonable factfinder may conclude that there is sufficient evidence of pretext to defeat summary judgment.  Pls' Brief at 16.

Plaintiffs' disbelief of Defendants' reasons is not sufficient to create a triable issue of fact

on the discrimination claim.  Even if Defendant's reasons are rejected entirely, Plaintiffs still must produce evidence from which a reasonable factfinder could infer that a discriminatory motive played a role in Defendants' failure to convert and that Defendant's asserted reasons were merely a pretext for discrimination.  Fisher v. Vassar Coll., 114 F.3d 1332, 1339 (2d Cir. 1997).  Although the fact that "an employer gives a pretextual reason for its action may indeed give support to the inference of prohibited discrimination," "the mere fact of a pretextual explanation, without circumstances suggesting that the true motivation" was discriminatory, is insufficient to support Plaintiff's case.  McCarthy, 202 F.3d at 166; see also Lizardo v. Denny's Inc., 270 F.3d 94, 104 (2d Cir. 2001) (to withstand summary judgment, plaintiffs needed to do more than "cite to their mistreatment and ask the court to conclude that it must have been related to [discrimination]").  Moreover, in a case such as this, "[b]ecause [Defendants'] stated reasons for the challenged action are strongly supported by the evidence, the burden on plaintiff to prove that they are a pretext for discrimination [is] substantial."  Lucibello v. Yale-New Haven Hosp., 2005 U.S. Dist. LEXIS 3604, at *22, 2005 WL 578324, at *7 (D. Conn. Mar. 10, 2005); see also Lieberman v. Gant, 630 F.2d 60, 65 (2d Cir. 1980) (holding that to allow a jury to discredit the defendant's proffered reasons for its actions, the plaintiff must show that defendant's reasons are "so ridden with error that [the defendant] could not honestly have relied upon [them]"); Fuentes v. Perskie, 32 F.3d 759, 765 (3rd Cir. 1994) (to discredit the employer's proffered reasons, plaintiff must demonstrate "weaknesses, implausibilities, inconsistencies, or contradictions in [them]").

     In this case, the Court finds no evidence showing either that Defendants' asserted reasons are pretextual.  Plaintiffs cannot simply rely on the assertion, unsupported by the record, that

Defendants' reason is pretext for discrimination.  Plaintiffs also argue that Defendants applied the articulated policy inconsistently, however, the Court can find no evidence supporting that contention.  See Pls' Brief at 17.

Finally, even if Plaintiffs could prove pretext, there is a complete lack of evidence going to show that Plaintiffs' national origin played any role in Defendants' failure to convert them.  As discussed above, it is undisputed that no PTF mail handlers, regardless of national origin, were converted to FTR employees at the Hartford P&DC from February 2001 to April 2005.  Moreover, it is undisputed that plaintiff Joseph was among the first four PTF mail handlers to be converted in April 2005 and that the one mail handler ahead of plaintiff Joseph on the PTF seniority list was white and eleven of the twenty-three mail handlers ahead of plaintiffs George and Matthew on the seniority list were white.  In light of these facts, there is no evidence giving rise to an inference of disparate treatment, as Plaintiffs were treated no differently than similarly situated employees who were not members of the protected group.  See Abdu-Brisson, 239 F.3d at 468.  Accordingly, Defendants' Motion for Summary Judgment as to Plaintiffs' disparate treatment claim is **granted**.

### B.     Retaliation

Plaintiffs George and Matthew claim in Count II of their Complaint that they were retaliated against by several USPS supervisors in response to their filing of EEO charges.  Their retaliation claim is also analyzed under the three-part burden shifting analysis set forth in McDonnell Douglas, 411 U.S. 792.  To make a prima facie case of retaliation, Plaintiffs must show by a preponderance of the evidence (1) that they participated in a protected activity known to Defendants; (2) the existence of an adverse employment action; and (3) a causal connection

between the protected activity and the adverse employment action.  Terry v. Ashcroft, 336 F.3d 128, 141 (2d Cir. 2003) (citation omitted).  Again, a plaintiff's burden at this stage is de minimus.  Id.  Once Plaintiffs have established a prima facie case, the burden shifts to Defendants to show that they had a legitimate, non-discriminatory reason for the adverse employment action.  Id. at 94-95.  If Defendants are able to make this showing, then the burden shifts back to Plaintiffs to prove that the proffered reason is merely a pretext for unlawful discrimination.  Id. at 95.

Defendants argue that Plaintiffs cannot establish a prima facie case of retaliation. Specifically, Defendants contend that Plaintiffs' retaliation claim fails on the second and third prongs, in that the alleged retaliatory actions do not rise to the level of "adverse employment actions" and that the circumstances permit no inference of any retaliatory motivation.  Defs' Brief at 26.

In their Complaint, Plaintiffs identify one instance of retaliatory discrimination, namely, that "in April 2004 co-plaintiff George was denied a regularly scheduled lunch break and [was] issued a written warning for insubordination when he challenged the denial of the lunch break." Compl. ¶ 13.  In their depositions and in their brief, Plaintiffs George and Matthew identify several additional instances of retaliatory acts, which include being denied requested leave time (each Plaintiff was able to identify only one instance where their leave request was denied), George Depo. at 121-25, 132-33, 151, 160-62; Matthew Depo. at 68-69; having their days off changed, Matthew Depo. at 73; having break time shortened, George Depo. at 144-45; and being more frequently assigned to "hard" work places with heavy workloads without assistance, George Depo. at 136, 144-47.  See Pls' Brief at 18.

None of the employment actions cited by Plaintiff rise to the level of being "adverse." Many of the acts complained of seem to be a function of Plaintiffs' jobs as PTF employees and not retaliatory acts.  Plaintiffs admit that as PTF employees, they "have to [work] everywhere," have no fixed schedules or workplace assignments, are not guaranteed a certain number of hours per week, have no right to place themselves on the overtime list, have no right to bid on jobs and do not receive paid holidays.  See Morissette Depo. at 10-11; George Depo. at 136; Defs' Rule 50(a)(1) Statement ¶ 9.  Moreover, PTF employees must be generally "available to work flexible hours as assigned by the Employer during the course of a service week."  CBA Art. 7.1(A2), Morissette Decl. at Exh. A; Defs' Rule 50(a)(1) Statement ¶ 9.

Plaintiffs' other allegations regarding alleged "retaliatory" actions also do not approach the level of adverse employment actions.  For example, plaintiff George claims that it was retaliatory for his supervisor to give him a "predisciplinary interview" for returning late from his lunch break, for writing him up for being AWOL (Absent Without Leave) when he "got tired" and went home during working hours and for "making" him work until the end of the work day. See George Depo. at 166-70, 148-49, 173. Moreover, Plaintiffs present no evidence to show that the "heavy" or "hard" duties assigned were unsuited to their skills or inconsistent with their positions.  Indeed, they testified that they were among the duties normally assigned to them as PTF employees and they had performed some of the duties of which they complain prior to filing their EEO complaints.  See Morrison, 363 F. Supp. 2d at 591; see also George Depo. at 136, 144-47.

None of the actions complained of constitutes a "materially adverse change in the terms and conditions of employment."  Richardson v. New York State Dep't of Corr. Serv., 180 F.3d

19

426, 446 (2d Cir. 1999).  Indeed, cases involving similar allegations have held that the similar

acts complained of did not constitute "adverse employment actions."  <u>See</u>, <u>e.g.</u>, <u>Sanders v. N.Y.</u>

<u>City Human Res. Admin.</u>, 361 F.3d 749, 756 (2d Cir. 2004) (negative performance evaluations

with no "effect on the terms and conditions of . . . employment"); <u>Morrison v. Potter</u>, 363 F.

Supp. 2d 586, 591 (S.D.N.Y. 2005) ("denying plaintiff assistance with . . . workload,"

reprimands, even those causing embarrassment and anxiety, close monitoring); <u>Bond v. City of</u>

<u>Middletown</u>, 389 F. Supp. 2d 319, 331 (D. Conn. 2005) ("criticisms of [a plaintiff's] work

performance");  <u>Johnson v. State of Connecticut</u>, 392 F. Supp. 2d 326, 340 (D. Conn. 2005)

(informal counseling); <u>Hunter v. St. Francis Hosp.</u>, 281 F. Supp. 2d 534, 544 (E.D.N.Y. 2003)

(negative evaluations, denial of leave request, quantity of work assigned); <u>Neratko v. Frank</u>, 31 F.

Supp. 2d 270, 296 (W.D.N.Y. 1998) (scheduling changes).

     Even if the actions Plaintiffs complain of were sufficiently adverse, Plaintiffs have not

shown the requisite "causal connection" between the protected activity and the actions claimed to

be adverse.  It is undisputed that the three supervisors who took the actions of which Plaintiffs

complain—Maria Prattson, Bill Schmollinger and Ric Olivia—did not learn of Plaintiffs'

protected activity until the spring or summer of 2005.[12]  <u>See</u> Defs' Rule 56(a)(1) Statement ¶¶ 40-

42; Pls' Rule 56(a)(2) Statement ¶¶ 40-42.  Accordingly, it is undisputed that the supervisors

learned of the protected activity <i>after</i> all but one of the acts Plaintiffs cite as retaliatory.  <u>See</u>

---

[12]    Prattson testified that she did not hear of Plaintiffs' EEO complaints until a few weeks before her
May 3, 2005 deposition.  <u>See</u> Prattson Depo. at 21.  Schmollinger did not have knowledge of the
EEO complaints until late April or early May 2005.  <u>See</u> Schmollinger Aff. ¶ 8.  Olivia first
learned of the EEO complaints from Defendants' counsel on June 13, 2005.  <u>See</u> Olivia Aff. ¶ 7.

USPS Mem. at 28-29.[13]  The alleged retaliatory acts of which Plaintiffs complain happened before—or at least began before—Plaintiffs filed their EEO complaints in March 2004.[14] Plaintiffs present no evidence showing that the supervisors were acting at someone else's behest and therefore, the supervisors' undisputed lack of knowledge precludes Plaintiffs from establishing the requisite causal connection and negates any inference that the supervisors' actions were motivated by the Plaintiffs' EEO filings.  See Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 95 (2d Cir. 2001) (When the alleged adverse job actions began before a plaintiff engaged in protected activity, "an inference of retaliation does not arise.").

For the reasons discussed herein, i.e., that the actions complained of were not sufficiently "adverse" and that Plaintiffs' have not shown a causal connection between their protected actions and the actions complained of, Defendants' Motion for Summary Judgment as to Plaintiffs' retaliation claim is **granted**.

## C.    Hybrid § 301 / Fair Representation Claims

In Count III of their Complaint, Plaintiffs claim that USPS' failure to convert them from PTF employees to FTR status breaches Article 7.3 of the CBA between USPS and NPMHU and that the continued breach of the CBA violates Section 301 of the LMRA.  Compl. ¶ C.11. Plaintiffs also claim, in Count IV, that, pursuant to Section 301 of the LMRA, 29 U.S.C. § 185, NPMHU breached its duty of fair representation in failing to pursue Plaintiffs' grievances.

---

[13]    The only action shown to occur after Plaintiffs' supervisors learned of their protected activity was the change in Matthew's work schedule, an action that is clearly not "adverse."  See Neratko, 31 F. Supp. 2d at 296.

[14]    For example, Plaintiff George complains about the denial of leave requests but testified that a number of instances of such denials took place in 2003, prior to his filing of the EEO complaint. See George Depo. at 124-25, 132.  Moreover, Plaintiffs had worked in areas they considered "hard" or undesirable before they filed their EEO complaints.  See id. at 136, 145-47.

Compl. ¶ D.11.

DFR claims that arise in conjunction with a claim regarding the union's administration of the collective bargaining agreement are typically "hybrid" § 301/fair representation claims which necessarily combine two causes of action: (1) a claim against the employer for breach of the collective bargaining agreement, brought under § 301 of the LMRA, 29 U.S.C. § 185, and (2) a claim against the union for violation of its DFR based on its handling of the employee's grievance. See DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 164-65 (1983). Because the grievance and arbitration procedures provided for in the CBA otherwise precludes recourse to the courts for violations of the CBA, an allegation that NPMHU breached its DFR in its handling of Plaintiffs' grievances is a necessary predicate to a § 301 claim against the employer, USPS, in federal court. Id. at 163-64; Wilder v. GL Bus Lines, 258 F.3d 126, 129 (2d Cir. 2001). Similarly, because a union cannot be found to have violated its DFR if the employer did not breach the CBA, a finding that the employer breached the CBA is a necessary predicate to a DFR claim against the union.

Due to the interdependent nature of the claims against the employer and the union in a hybrid § 301/DFR case, the Supreme Court has provided that a plaintiff in such a case must make a two-pronged showing to recover against either the employer or the union:

> To prevail against either the company or the Union, employee-plaintiffs must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating breach of duty by the Union. The employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the same whether he sues one, the other, or both.

DelCostello, 462 U.S. at 165 (internal brackets, citations, ellipses and quotation marks omitted). Accordingly, Plaintiffs in this action must show both that USPS' action violated the terms of the

CBA *and* that NPMHU breached its DFR.  See Terry, 494 U.S. at 594.

        1.     A Determination that USPS did not Violate the CBA or that NPMHU did not Violate its DFR is Dispositive of the Remaining Claim

As explained in the preceding section, Plaintiffs must show both that USPS' action violated the terms of the CBA *and* that NPMHU breached its DFR.  See Terry, 494 U.S. at 594. If Plaintiffs are unable to prove that USPS did not violate the terms of the CBA, summary judgment must be granted on the DFR claim, as the Union clearly cannot breach its DFR if the USPS acted in compliance with the CBA.  Similarly, if Plaintiffs are unable to prove that NPMHU breached its DFR, they cannot proceed with their claim against the USPS, as the grievance and arbitration procedures of the CBA are the exclusive remedies for claims of breach of that agreement.  Such claims are actionable in court only if Plaintiffs can establish that NPMHU breached its DFR in failing to prosecute their grievances.  As Plaintiffs are unable to prove *either* claim, as explained below, this provides an additional reason why summary judgment must be granted on both.

        2.     NPMHU's Duty of Fair Representation

The duty of fair representation ("DFR") is a judicially-created doctrine that the Supreme Court found to be implicit in § 9 of the NLRA, 29 U.S.C. § 159.[15]  This provision provides that the union is the exclusive bargaining representative of all employees in a particular bargaining unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment.  29 U.S.C. § 159(a).  In Vaca v. Sipes, 386 U.S.

---

[15]    The NLRA does not apply to public-sector employment by its own terms, however, it is made applicable to postal employment by the Postal Reorganization Act of 1970 ("PRA"), 39 U.S.C. § 1209(a).

171, 177 (1967), the Supreme Court explained that, "as the exclusive bargaining representative of the employees in [Plaintiffs'] bargaining unit, the Union had a statutory duty fairly to represent all of those employees, both in its collective bargaining with [the employer], . . . and in its enforcement of the resulting collective bargaining agreement . . . ." The union's duty requires it "to serve the interests of all [bargaining unit] members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." Id. A union's breach of its DFR "is not limited to intentional conduct . . . but may include acts of omission . . . [if the acts are] so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate Union interests as to be arbitrary." NLRB v. Local 282 Int'l Bhd. of Teamsters, 740 F.2d 141, 147 (2d Cir. 1984) (quotation and citations omitted).

The Second Circuit has held that "[a] union breaches its duty of fair representation only where its actions can fairly be characterized as so far outside a wide range of reasonableness that they are wholly arbitrary, discriminatory, or in bad faith." Wilder, 258 F.3d at 129 (internal alterations omitted) (quoting Spellacy v. Airline Pilots Ass'n, 156 F.3d 120, 126 (2d Cir. 1998)); see also Air Line Pilots Ass'n v. O'Neill, 499 U.S. 65, 67 (1991). Moreover, in Vaca v. Sipes, 386 U.S. at 191-92, the Supreme Court said that although "a union may not arbitrarily ignore a meritorious grievance," individual employees do *not* have "an absolute right" to "compel arbitration of a grievance regardless of its merit." A union must, however, administer the grievance and arbitration process and make decisions with regard to the merits of grievances "in good faith and in a nonarbitrary manner." Id. at 192-94 (holding that "a union does not breach its duty of fair representation . . . merely because it settles the grievance short of arbitration").

24

As suggested by the case law, a union's decision not to file a grievance or not to take a grievance to arbitration is entitled to considerable deference:

> Where the fair representation dispute involves the union's interpretation of the collective bargaining agreement, the test is not whether the grievant's contractual interpretation is correct or more reasonable than the union's. Rather, the essence of fair representation is the reasonableness of the union's interpretation. So long as it acts "according to its own reasonable interpretation of the labor contract," a union may lawfully refuse to arbitrate an employee's grievance . . . .

William W. Osborne, Jr., ed., Labor Union Law and Regulation 330-31 (2003). In determining whether a union violated its DFR, a court's "inquiry is limited to whether the union took a position on the basis of an informed, reasoned judgment regarding the merits of the [employees'] claim in light of the language contained in the collective bargaining agreement." Spellacy, 156 F.3d at 127. Importantly, a court need not find, on the merits, that the union's interpretation of the collective bargaining agreement was *correct*, only that such an interpretation was reasonable. Id.; see also Miller v. USPS, 985 F.2d 9, 12 (1st Cir. 1993) (holding that "[c]ourts may not substitute their own views for those of the union" and must "allow the union great latitude in determining the merits of an employee's grievance and the level of effort it will expend to pursue it").

In light of the considerable deference to be accorded to Morissette's decision not to prosecute Plaintiffs' grievances, it is hard to see how the reasoned decision not to do so could constitute a breach of NPMHU's DFR. Whether or not this decision was ultimately the correct one, the union's interpretation of the CBA was not "unreasonable," as it acted appropriately and responsibly with regard to Plaintiffs' requests that grievances be filed.

Specifically, the undisputed evidence shows that when Branch President René Morissette

received Plaintiffs' letters in February 2004, he reviewed the CBA and investigated the schedules

Plaintiffs worked during the previous six months, in or around August 2003 through February

2004.[16]   See Morissette Decl. ¶ 3.  Morissette's review of Plaintiffs' "clock rings" disclosed that

none of the Plaintiffs had, during the period of August 2003 through February 2004, worked the

schedule specified in Article 7.3—i.e., eight hours within ten, on the same five days each

week—that arguably would have provided a basis for a grievance seeking conversion to FTR

status.  See Morissette Depo. at 25-28; Morissette Decl. ¶ 4.  Morissette also reviewed the

Hartford installation's seniority list and found that the facility was well above the ninety percent

full-time employment level required by Article 7.3.  Morissette Depo. at 25-28; Morissette Decl.

¶¶ 3-4.

Upon completion of his investigation, Morissette responded to Plaintiffs' letters,

explaining that none of the Plaintiffs satisfied the requirement of working eight hours within ten

on the same five days each week over the relevant six-month period, that the Hartford facility

was well above the ninety percent full-time employment level, and that even if the union did win

a grievance, the PTF employee working the requisite schedule would not become a FTR

employee but rather a full-time bid would be created, which would go to the most senior PTF on

the seniority list.  George Depo. at Exh. 4; Joseph Depo. at Exh. 4; Matthew Depo. at Exh. 4.

---

[16]   The CBA between USPS and NPMHU provides that a grievance must be brought "within fourteen (14) days of the date on which the employee or the Union first learned or may reasonably have been expected to have learned of its cause."  CBA Art. 15.2, Morissette Decl. at Exh. A. Accordingly, Plaintiffs' grievances, alleging breach of the CBA based on the hours they claim to have worked during a six-month period, could only be based on the six-month period ending no earlier than 14 days prior to the grievance.  Plaintiffs' request that NPMHU file grievances on their behalf was made on or about February 11, 2004.  Therefore, the only six-month period on which grievances alleging a breach of Article 7.3 could have been based would be one beginning in early to mid-August 2003 and ending in late-January or early-February 2004.  Accordingly, Plaintiffs' work records during earlier periods cannot have form the basis of a claim that NPMHU breached its DFR or that USPS breached the CBA.

Morissette concluded his letter by saying that, "[w]hile the Union would love to file a grievance for all part-time flexible to be converted to full-time regulars we are bound by the National Agreement," pursuant to which, Morissette explained, the Union could only "file a grievance for conversion . . . if the 90/10 ratio was exceeded."  Id.

A union representative, such as Morissette, is "entitled to decline to put forward an interpretation of the collective bargaining agreement which he and his union reasonably believed was incorrect."  Early v. Eastern Transfer, 699 F.2d 552, 557 (1st Cir. 1983) (citing Findley v. Jones Motor Freight, Inc., 639 F.2d 953, 960 (3d Cir. 1981); Cannon v. Consolidated Freightways Corp., 524 F.2d 290, 294 (7th Cir. 1975)).  Defendants have presented evidence to suggest that such was the situation here, arguing that Morissette "not only saw no contractual basis for the grievances plaintiffs wished to file, but he also believed that to file such meritless grievances would only hurt the union's credibility and make it more difficult to win legitimate grievances."  NPMHU Brief at 8 (citing Morissette Decl. ¶ 5).

Plaintiffs argue that they approached Morissette regarding their concerns in 2000 and 2001.  The only evidence in support of this assertion is plaintiff George's vague testimony that he communicated with Morissette sometime between June 2000 and September 2001 about his desire to be converted.  See George Depo. at 44-46.  Plaintiffs contend that these communications continued when Morissette became Branch President in 2001.  It is undisputed that Plaintiffs each made a written request for Morissette to pursue grievances on their behalf in February 2004, however, there is little evidence supporting their contention that they "shared knowledge of arbitration decisions sustaining the conversion of PTF employees at other USPS installations."  Pls' Brief at 9.  Plaintiffs' only evidence in this regard is Matthew's assertion, in his deposition,

27

that he told Morissette about arbitration decisions in support of his position that he found "online somewhere," although he did not give him copies of the decisions.  See Matthew Depo. at 28-30. Plaintiffs also highlight the facts that despite Article 12, conversions took place in February 2001 and April 2005, and that the decision to convert PTF employees to FTR status was within management's discretion based upon the operations needs of the particular installation at issue. Gillis Depo. at 11-12.

Plaintiffs' arguments are insufficient.  Even if plaintiff George had spoken with Morissette previously and even if plaintiff Matthew told him about certain arbitration decisions, those facts are irrelevant if, as is shown here, Morissette reasonably believed that there was no basis in the CBA for a grievance.  Plaintiffs cannot point to anything showing that Morissette's actions were unreasonable, whereas Defendants have put forth numerous reasons for Morissette's actions, including the fact that he saw no contractual basis for the grievance and feared that filing a meritless grievance would undermine NPMHU's credibility and make it more difficult to win legitimate grievances.  NPMHU Brief at 8.  Accordingly, Morissette's assessment of the merits of Plaintiffs' complaints and his decision not file grievances appears to have been made "in good faith and in a nonarbitrary manner."  Vaca v. Sipes, 386 U.S. at 194.  If, as Plaintiffs argue, the decision to convert PTF employees is within management's discretion, that fact buttresses, rather than undermines, Defendants' argument that Morissette's belief was reasonable.  Accordingly, this Court finds that Plaintiffs have not shown a material issue of fact and **grants** Defendants' Motion for Summary Judgment as to Plaintiffs' claim that NPMHU breached its duty of fair representation.

        3.        USPS's Alleged Breach of the CBA

Plaintiffs claim that USPS's failure to convert them from PTF employees to FTR status breaches the Article 7.3 of the CBA.  Compl. ¶ C.11.

        a.      *Plaintiffs George and Matthew Had No Contractual Right to be Converted and Lack Standing*

Plaintiffs George and Matthew were so far down on the seniority list, ranking twenty-fourth and twenty-sixth, respectively, that even if USPS had been obliged to convert three PTF employees to FTR employees, as Plaintiffs contend, Plaintiffs George and Matthew would not have been converted.  If a PTF employee is shown to have worked eight hours within ten on the same five days each week during a consecutive six-month period, as required by Article 7.3 of the CBA, this would demonstrate the need for another full-time position, however, that position would be awarded in order of seniority, and would not necessarily go to the specific employee that worked the requisite amount.[17]  Accordingly, Plaintiffs cannot establish that USPS' failure to convert George and Matthew to FTR employees violated the CBA because even if Plaintiffs' allegations are correct and they had demonstrated the need for three conversions, those three positions would have gone to the first three PTF employees on the seniority list.

This can, in the alternative, be considered as a standing issue.  Article III of the United States Constitution requires plaintiffs to be able to demonstrate standing in order to bring a federal action.  In order to satisfy Article III's standing requirement, Plaintiffs must show: (1) an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural

---

[17]    As discussed above, conversions of PTF employees to FTR status are made in order of seniority. The CBA provides that PTF employees "are placed on a part-time flexible roster in the order of the date of their appointment" and for purposes of conversions, "they shall be taken in the order of their standing on the part-time flexible roster."  CBA Art. 12.2(E), Morissette Decl. at Exh. A; <u>see also</u> George Depo. at 13-14 (testifying that twenty-four PTF employees would have to be converted in order for him to get a FTR position).

or hypothetical; (2) fairly traceable to the challenged action of the Defendants; and (3) must also show that it is likely, as opposed to merely speculative, that the injury will be redressed by a decision in their favor.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  Because converting three PTF employees to FTR status would not have changed George or Matthew's positions in any respect, they have suffered no "injury in fact" and are therefore unable to establish standing to pursue the claim that USPS violated the CBA.  Id.

        b.    *The CBA Did Not Require Conversions Based on the Hours Plaintiffs Worked*

Plaintiffs also fail to establish that the schedules they worked entitled them to be converted to FTR employees under Article 7.3 of the CBA.  Article 7.3 reads, in relevant part:

> The Employer shall staff all postal installations which have 200 or more man years of employment in the regular work force as of the date of this Agreement with 90% full-time mail handlers. . . .  The Employer shall maximize the number of full-time employees and minimize the number of part-time employees who have no fixed work schedules in all postal installations.  A part-time flexible employee working eight (8) hours within ten (10), on the same five (5) days each week over a six-month period will demonstrate the need for converting the assignment to a full-time position.

CBA Art. 7.3, Morissette Decl. at Exh. A.  Plaintiffs claim that because they "consistently" worked forty-hour weeks, they have a right to conversion under the CBA.  The evidence produced by Defendants, however, shows that Plaintiffs failed to meet the requirement in the CBA that they work eight hours within ten, on the same five days each week over a six-month period.

Plaintiffs have presented no evidence showing that any of them worked "eight hours within ten, on the same five days each week" during the relevant six-month period, as required

by Article 7.3 of the CBA to demonstrate a need for conversion.[18]   In their relative depositions,
all three plaintiffs agreed that the Time and Attendance Collection System ("TACS")—the
timekeeping system used by USPS to record employees' time and attendance
information—would be authoritative with regard to the hours and days they had worked.  See
George Depo. at 198; Joseph Depo. at 29; Matthew Depo. at 21-22, 24-26.  A review of the
TACS records revealed that during the relevant time period, i.e., from February 15, 2003 through
February 13, 2004, none of the plaintiffs worked eight hours within ten, on the same five days
each week, for a consecutive six-month period.  See Taylor Decl. ¶ 3.  There is no factual dispute
on this issue.

Specifically, from August 2002 to late 2003, plaintiff Matthew worked principally as a
supervisor rather than as a mail handler.[19]   Matthew acknowledged, in his deposition, that during
the period he worked as a supervisor he did not work any forty-hour weeks as a mail handler.
See Matthew Depo. at 23-24.  A review of the TACS reports reveals that from early 2003
through the end of August 2003, Matthew worked almost exclusively as a supervisor and that
from August 2003 through the end of 2003, he continued to work a "large portion of his hours as
a supervisor."  Matthew only worked forty hours as a mail handler two weeks out of the entire
year of 2003 and moreover, during the first ten weeks of 2004, when he worked exclusively as a
mail handler, he worked forty-hour weeks only seven times.  USPS Brief at 19 (citing Taylor

---

[18]   Although Plaintiffs deny Defendants' assertion that none of them fulfilled this requirement, see
Pls' Rule 56(a)(2) Statement ¶ 26, they cite only to all three plaintiffs' deposition transcripts in
their entirety, none of which provides sufficient support for their denial.

[19]   The hours plaintiff Matthew worked in a supervisory position, which is outside the mail handler
"craft," are not relevant in determining whether a mail handler position should be converted under
Article 7.3.  See USPS Brief at 18 (citing Gillis Depo. at 19).

31

Decl. ¶¶ 4-5).  Accordingly, during the relevant six-month period, Matthew only worked nine forty-hour weeks as a mail handler.

Plaintiff Joseph also did not consistently work forty-hour weeks during the relevant six-month period.  According to the TACS reports, Joseph worked less than forty hours during eight weeks of the six-month period from early August 2003 through early February 2004.  USPS Brief at 19 (citing Taylor Decl. ¶ 6).  Accordingly, during the relevant six-month period, Joseph worked only sixteen forty-hour weeks.

Finally, the TACS reports revealed that plaintiff George also did not work eight hours within ten hours, on the same five days each week over the relevant six-month period (February 15, 2003 through February 13, 2004).  Taylor Decl. ¶ 3.  George also worked the majority of his hours during 2003 as a supervisor rather than as a mail handler, working "almost exclusively as a mail handler through pay period 15 of 2003, and thereafter as a mail handler." Id. ¶ 4.

Although arbitrators have held that the fact that a PTF employee did not *strictly* meet the eight hours within ten, on the same five days each week over a consecutive six-month period requirement is not fatal to a claim for conversion, the cases reviewed reveal situations in which the grievants worked schedules deviating only slightly from the stated requirement.  See USPS and NPMHU, No. J98M-1J-C 99236940 (Feb. 2, 2000) (Benn, Arb.) (Defs' Exh. P; Pls' Exh. 7A) (PTF employee met the requirement with the exception of two days in the six-month period when he worked 5.66 and 4.04 hours); USPS and NPMHU, No. E00M-1E-C03140540 SJ1003 (May 26, 2004) (Escamilla, Arb.) (Defs' Exh. Q; Pls' Exh. 7C) (the PTF employee met the requirement, except that "on very infrequent occasions" when he worked six or seven hours per day, however, "the Grievant worked in excess of 40 hours in the weeks when this occurred");

<u>USPS and NPMHU</u>, K00M-1K-C 03143829 (Feb. 19, 2004) (Trosch, Arb.) (Pls' Exh. 7D) (granting the greivance as to the two PTF employees who worked less than the requirement only three times and five times out of a thirty-two-week period, but denying it as to a PTF employee who worked less than the requirement seven times out of the thirty-two-week period).  The evidence presented by Defendants and not rebutted by Plaintiffs reveals that Plaintiffs' schedules were much less consistent than the ones in the arbitration decisions cited (and less consistent than the grievance *denied* by Arbitrator Trosch, in which the plaintiff worked twenty-five forty-hour weeks in a thirty-two week period).  Even without following the "strict" formula laid out in Article 7.3, Plaintiffs' hours are not sufficient to compel the conclusion that the USPS was required to convert three PTF employees to FTR status.

Moreover, even if Plaintiffs' hours were sufficient to require conversion, Plaintiffs ignore the fact that the arbitration decisions they rely on were not dealing with the interaction of Article 7.3 and Article 12.6, as is the case here.  When faced with the interaction of the two provisions, National Arbitration precedent provides that although USPS is obliged to fill full-time vacancies under the maximization language of Article 7.3, USPS has an overriding obligation to withhold vacancies under Article 12.6 when it is necessary to do so.  <u>See USPS and NALC and APWU</u>, No. H7N-3D-C 22267 (Oct. 26, 1990) (Mittenthal, Arb.) (Defs' Exh. S); <u>NALC, AFL-CIO and USPS and APWU, AFL-CIO</u>, NC-E-16340 (National) (Dec. 7, 1979) (Gamser, Arb.) (Defs' Exh. T); <u>USPS and NALC, AFL-CIO</u>, No. N-S-116 (Regional) (Oct. 24, 1972) (Holly, Arb.) (Defs' Exh. U).  Arbitrator Mittenthal reviewed relevant precedent and held, in light of prior decisions, that Article 12.6 takes precedence over Article 7.3:

[T]he maximization requirement of Article 7, Section 3B [including the 90:10

33

> staffing requirement] must defer to the withholding obligation of Article 12, Section 5. Maximization, in other words, does not demand immediate filling of full-time carrier vacancies when Management is at the very same time obliged by Article 12, section 5 to withhold those vacancies in order to protect clerks who are soon to be displaced because of some technological or operational change.

Mittenthal Award at 10-11. Mittenthal extended prior rulings by holding that Article 12's withholding obligation took precedence not only over the general maximization requirement in Article 7.3, but also over its more specific requirement of ninety percent full-time employment at larger facilities. Id. at 11. It is easy to reason, in light of this conclusion, that Article 12's withholding obligation would also take precedence of Article 7.3's language regarding hours worked.

According to National Arbitrators Gamser and Mittenthal, the USPS's right to withhold vacancies pursuant to Article 12 is "circumscribed only by the limitation that it do so *reasonably*." USPS and NPMHU, No. MH2002012 (Apr. 16, 2004) (Lankford, Arb.) (Pls' Exh. 7B); see also Mittenthal Award at 6-11; Gamser Award at 4. Pursuant to this "rule of reason," such withholding "cannot be extended without limit, else the maximization clause would be rendered meaningless." Holly Award at 8. Accordingly, withholding for a "reasonable period" is appropriate "so long as Management was at the 90-10 staffing ratio at the end of the period." Mittenthal Award at 11. In this case, the USPS asserts that the District of Connecticut was proceeding under Article 12 and withholding bids that became vacant from February 2001 through July 1, 2004. Gillis Aff. ¶ 20. Although it is questionable whether this is a "reasonable time," the fact that the Hartford P&DC was in compliance with the 90-10 staffing ratio at all relevant times and the fact that no Plaintiff demonstrates, based on hours worked, the need for conversion indicates that the failure to convert was not unreasonable.

34

Adding further support to this conclusion is Arbitrator Gamser's ruling that the USPS "may be permitted to avoid a total maximization of his full-time work force if such action could be justified by some 'standard of practicability.'" Gamser Award at 4. This "standard of practicability" applies to situations in which maximizing the full-time work force would cause "significant increased costs, increased idle time during scheduled tours, or have a detrimental impact upon the efficiency of the operation." Another possible basis for not converting certain PTF positions to FTR status would be "the adverse impact that such conversion would have upon management's flexibility in meeting its responsibility, recognized in the National Agreement, to 'direct the workforce.'" Id. Gamser concluded by saying that the USPS can be forced to convert only where the union clearly demonstrates a "flagrant violation" of Article 7.3, or where "the evidence shows manifest failure to deal realistically with some specific, identifiable work assignment." Id. If those situations are sufficient to justify a failure to convert, certainly withholding pursuant to Article 12 in anticipation of positions being eliminated or "excessed" due to automation would also be a sufficient basis for not converting PTF employees, especially when those employees are unable to demonstrate a need for conversion. In any event, USPS's failure to convert was certainly not a "flagrant violation" of Article 7.3.

Finally, Plaintiffs argue, in reliance on Arbitrator Lankford's ruling, that USPS's failure to provide evidence as to the actual number of USPS employees transferred to the Hartford installation as a result of the automation and consolidation was a breach of the CBA. Pls' Brief at 13. Arbitrator Lankford held that Article 12 requires the USPS to "discuss" with the Union the USPS's continuing decision to withhold positions and that, in that case, its failure to offer an explanation or factual basis for withholding violated Article 12. Lankford Arb. at 4. This

35

argument fails on two grounds.  First, the USPS *has* provided an explanation for withholding, namely, that the introduction of the Automated Flat Sorting Machine 100 Model and the Automated Parcel and Package Sorter and the consolidation of the Bridgeport and Waterbury facilities was expected to eliminate, or "excess," the jobs of a number of postal employees, particularly those who sort the mail.  See USPS Brief at 2.  Specifically, Defendants assert that the introduction of the Automated Parcel and Package Sorter alone was expected to eliminate forty-eight clerk jobs at the Hartford P&DC and sixty-six in Wallingford.  See id. (citing Gillis Aff. ¶¶ 15-16).  Second, Lankford held that the USPS is required to discuss its decision to withhold with the *Union*.  Lankford Arb. at 4.  It is Plaintiffs here, not the Union, who is contesting the USPS's decision to withhold.  There is no evidence showing that the Union asked the USPS for more information regarding their decision to withhold vacancies or that the USPS failed to provide relevant information.  Moreover, René Morissette, President of Branch 34 of NPMHU, has indicated his opinion that the USPS was in compliance with the CBA and was under no obligation to convert Plaintiffs to FTR positions.  See George Depo., Exh. 4; Joseph Depo., Exh. 9; Matthew Depo., Exh. 13; see also Morissette Decl. at ¶¶ 3-5; Morissette Depo. at 25-30, 42-43.  Morissette clearly believed that he had sufficient information from the USPS to make this determination.  Accordingly, Defendants' Motion for Summary Judgment as to the claim that USPS breached the CBA is granted.

## V.    CONCLUSION

For the foregoing reasons, Defendant NPMHU's Motion for Summary Judgment [Doc. No. 35] is **granted** and Defendants USPS' Motion for Summary Judgment [Doc. No. 39] is **granted**.  The Clerk shall close the case.

SO ORDERED.

Dated at New Haven, Connecticut, March  28 , 2006.

_____
/s/
Peter C. Dorsey, U.S. District Judge
United States District Court